[Crim. No. 5713.   In Bank.   June 10, 1955.]

THE PEOPLE, Respondent, v. OSCAR LEON WILKES et al., Appellants.

Carl B. Shapiro for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, W. O. Weissich, District Attorney (Marin), and Roger P. Garety, Chief Criminal Deputy District Attorney, for Respondent.

SCHAUER, J.—Defendants appeal from judgments of conviction of burglary of the second degree, pursuant to jury verdicts, and from an order denying their motion for new trial. We have concluded that defendants were deprived of their right to have the evidence fairly appraised by the jury because of improper comment of the prosecuting attorney, the effect of which was made more serious by comment of the trial judge, as to the failure of the wife of defendant Wilkes to testify.

The evidence of guilt, which is circumstantial, is as follows: At about 3:30 a. m. on January 31, 1954, the night bartender at the Village Inn in Novato, Marin County, after having cleaned the premises, put cash and checks in the safe, and locked the safe and the doors and windows, left the building. At 7 a. m. the day bartender came to the Village Inn and found that the outside door and the door leading to the room in which the safe and the liquor were had been forced open. The dial and other parts had been knocked off the safe, the door was ajar, and boxes in which money and checks had been kept in the safe were on the floor. Plates and a spindle which had been part of the safe lock were lying inside the safe. On the floor near the safe were chips of paint. About $1,674 in cash and about a case and a half of whiskey had been taken. An officer who examined the doors which had been broken open, the safe and the boxes which had been in it, and a file cabinet which was in the room, found only old, smudged fingerprints, no fresh prints.

At about 1 a. m. on February 1, 1954, a deputy sheriff on patrol in a residential district of Fresno about two and one-half miles from Highway 99 found defendants asleep in the 1953 Chevrolet automobile of defendant Jones. The deputy summoned other officers. They awakened defendants, questioned them, and examined their car. Defendants were taken to the sheriff's office and questioned further.

As will hereinafter appear, there are numerous conflicts among defendants' various extrajudicial statements, their testimony at the preliminary hearing, and their testimony at the trial. As to one point their testimony and statements are consistent: that they were not in Novato at or near the time of the burglary.

At the time of defendants' arrest a pair of grip pliers with drift punch attached was found in Jones' car. Just after their arrest both defendants denied ownership of these instruments. At the trial Wilkes testified that he had never seen them before the preliminary hearing; Jones testified that they were first shown to him by one of the Fresno deputies and that to his knowledge they had not been in his car. In the opinion of an expert this punch had made marks on the spindle which was removed from the safe; this opinion was based on the distinctive similarity between the lines in marks made by the punch and the lines in tool-marks on the spindle.

In the car was a tire iron which Jones at the time of his

arrest admitted was his. At the trial, however, he testified that it had not been in his car. An expert testified that on the tire iron were chips of paint which had been transferred there under pressure; this paint was in layers of three distinct colors and was identical with chips of paint found at the scene of the crime.

In Jones' car were San Francisco newspapers dated January 27 and 30 and February 1, 1954. According to defendants, they bought the paper of February 1 in Bakersfield but had no knowledge of the other two papers.

The Fresno deputies found two boxes of washers in the car, one on the floor and one in a suitcase in the trunk. At the time of his arrest Wilkes said he had brought the washers from Arkansas. A Novato storekeeper identified the box from marks made on it during inventory as one which had been in his store shortly after the first of 1954. Wilkes testified at the trial that he was not shown the washers in Fresno, that he may have then stated that if there were washers in the car he may have put them there, but that he did not have washers in his suitcase.

Defendants when they were arrested had in their possession only about $370 and no whiskey.

Defendants' testimony at the trial is as follows: Defendant Jones, a resident of Texas, and defendant Wilkes, a resident of Arkansas, left Arkansas in Jones' car on the evening of January 25, 1954. Wilkes is a brick mason. Jones had sold his hauling business. They came to California to look for construction work. They entered California from Nevada at Truckee on the evening of Friday, January 29, drove through Sacramento, Stockton, Fresno, and Bakersfield, and arrived in Los Angeles late on the morning of Saturday, January 30. Wilkes telephoned the brick masons' union and was told that there was scarcity of brick work in Los Angeles but that there might be work available east of Los Angeles. It is not usual for union construction jobs to operate on Saturday, but defendants drove around looking for such jobs. They found no work.

At about 5 p. m. on the 30th defendants went into a bar in Los Angeles and stayed there until about 1 a. m. In the bar they met two women. Defendants left the bar in the company of the women and went to their apartment. They left the apartment at about 6 a. m. on Sunday, January 31. Defendant Wilkes then telephoned his wife in Arkansas from a public telephone booth. Mrs. Wilkes was defendant Jones'

sister. Jones also talked to her. At about 8 a. m. defendants went to the apartment of Wilkes' mother and stepfather. They left there before 10 a. m. At about noon they arrived in Bakersfield and rented a cabin at a motel. Wilkes registered under the name "J. L. Wright"; he testified that he did not know why he did this. Defendants were in Bakersfield until about 8 p. m. on Monday, February 1. While there they bought a San Francisco newspaper of February 1 for they intended to go to San Francisco to look for work. They went to Fresno, with Wilkes driving; Jones was asleep; Wilkes became sleepy, stopped, and also went to sleep. Defendants were awakened by the deputy sheriffs.

Shortly after defendants' arrest Jones stated that they were in Arizona on the night of January 30, 1954, that they entered California on Highway 66 and stayed in Bakersfield on the night of the 31st; Wilkes also stated that they had entered California on Highway 66 and arrived in Bakersfield on January 31. Later Jones told a deputy sheriff of Marin County that he had not been in California during the month of January, 1954. At the trial Jones denied that he had made the statement that defendants had entered California on Highway 66 and the statement that he was not in California during January.

The mother of defendant Wilkes testified in accord with defendants that they visited her in her Los Angeles apartment shortly after 8 a. m. on the morning of January 31. At the time of defendants' visit, she testified, she and her husband had lived in the apartment for about a week. The manager of the apartment house, however, testified on rebuttal that Wilkes' mother and stepfather did not move into the house until February 23.

The foregoing summary of the evidence shows the untenability of defendants' claim that the evidence against them is weak. ■■■ Evidence of guilt is furnished by their unexplained possession of burglarious tools which, according to expert testimony, were used to commit the crime (see *People* v. *Godlewski* (1943), 22 Cal.2d 677, 685 [140 P.2d 381]) and their contradictory (and therefore in part necessarily false) accounts to the authorities of their whereabouts in California, which may be considered as showing consciousness of guilt (see *People* v. *Cole* (1903), 141 Cal. 88, 90 [74 P. 547]; *People* v. *Peete* (1921), 54 Cal.App. 333, 353 [202 P. 51]). The evidence of consciousness of guilt is dramatically supplemented (if the rebuttal testimony of the landlord of Wilkes'

mother is believed) by the showing that the mother's cor‧ roboration of defendants' alibi was fabricated.

Wilkes asserts that the prosecuting attorney, in violation of the rule that a witness may be impeached by showing a prior conviction of felony but not of misdemeanor (Code Civ. Proc., § 2051; *People* v. *White* (1904), 142 Cal. 292, 294 [75 P. 828]), improperly asked him on cross-examination concerning his conviction of the misdemeanor of criminal contempt (Pen. Code § 166) founded on Wilkes' conduct while he was on the stand at the preliminary hearing. ■ The record of the trial shows that the prosecuting attorney did not ask Wilkes about a conviction of criminal contempt. He asked whether Wilkes had not refused, at the preliminary hearing, to answer concerning his whereabouts between 7 and 10 a. m. on Sunday, January 31, a time which was shortly after the burglary was committed in Novato and which was when Wilkes had testified at the trial that he was with his mother in Los Angeles. Objection to this question was correctly overruled; Wilkes' refusal to testify at the preliminary hearing could be shown for the purpose of impeachment (see *People* v. *Montgomery* (1941), 47 Cal.App.2d 1, 21 [117 P.2d 437]). Wilkes answered that he had refused to testify, and explained that he had taken the stand at the preliminary hearing against the advice of his attorney because "I had nothing to hide" but that he refused to state where he was on Sunday morning, January 31, because, although he had tried to give the authorities such information as he thought was relevant to the case, they "didn't check out" the information which he gave them. ■ In connection with his explanation of his refusal to answer the question at the preliminary hearing Wilkes volunteered the statement, "I received ninety days for that." No question of the prosecuting attorney called for Wilkes to mention the matter of his criminal contempt conviction. Since Wilkes himself chose to bring the matter to the attention of the jury he cannot now complain of it. (*People* v. *Schoon* (1918), 177 Cal. 678, 683-684 [171 P. 680] ; *People* v. *Simmons* (1946), 28 Cal.2d 699, 722 [172 P.2d 18].)

■ Wilkes complains that the prosecuting attorney, in an effort to impeach him, improperly questioned him concerning a prior misdemeanor conviction of forgery. Asked if he had ever been convicted of a felony Wilkes answered, "Yes, quite a few sir." He testified to two previous convictions of felony. The following then occurred: "MR. GARETY [prosecuting attorney] : Q. Was there a third felony?

A. I don't know if I was convicted of a felony that time or not.

"Q. What crime was that, forgery?

"MR. SHAPIRO [defendants' attorney]: I object to that.

"MR. GARETY: I think it is a proper question. He said he wasn't sure.

"THE COURT: The objection is overruled.

"MR. GARETY: Q. The third crime was a forgery?

"A. Yes, sir.

"MR. SHAPIRO: The question as to the nature of the crime is not determinative of whether he was convicted of a felony.

"THE COURT: I think the inquiry is proper as to whether he was convicted of a third felony.

"MR. GARETY: Were there any others you were convicted of? A. Felonies? No, sir."

Later in the cross-examination of Wilkes, when he was asked whether he had been in Marin County before, he volunteered the statement, "Yes. You convicted me of a felony here in Marin County, or a misdemeanor, I don't know."

According to defendants' briefs Wilkes' previous forgery conviction in Marin County was a misdemeanor, not a felony, because of the sentence imposed (Pen. Code, §§ 473, 17), and the district attorney should have known this and should not have asked defendant concerning conviction. However, the above quotation from the record shows that Wilkes was as active as the prosecuting attorney in bringing the matter to the attention of the jury. Furthermore, it is impossible to believe that this discussion as to the forgery conviction could have prejudiced Wilkes, in view of the fact that he had just admitted "quite a few" prior felony convictions and specifically identified two such convictions.

Defendants complain that they were not tried by a legally constituted jury because two members of the panel had as their private counsel, respectively, a deputy district attorney and the district attorney. Such a relationship of a juror with the district attorney is not a statutorily prescribed ground on which a challenge for implied bias must be allowed. Section 1074 of the Penal Code provides that "A challenge for implied bias may be taken for all or any of the following causes, and for no other"; such causes do not include having the district attorney or a member of his staff as private counsel, although they do include standing in the relation of attorney and client with the defendant or the person allegedly

injured by the offense charged or on whose complaint the prosecution was instituted.

One member of the jury panel testified that she had employed a deputy (not one who handled this case) to draw a will for her. Defendants' counsel challenged her for cause. The trial judge disallowed the challenge because it was not on a ground specified by statute. This prospective juror was later excused on peremptory challenge of defendants. Another member of the jury panel (who later became foreman of the jury) testified that the district attorney (who did not try this case) had represented him in a private suit in which he had won a judgment which he was trying to collect; the prospective juror further testified that this relation with the district attorney would not affect his ability to serve as a juror. Defendants did not challenge this juror. When the jury had been selected, defendants had 11 peremptory challenges which they had not used. Even if the trial judge had erroneously disallowed a challenge for cause, defendants could not complain that an objectionable juror was forced on them where they could have had him excused by peremptory challenge. (*People* v. *Troutman* (1921), 187 Cal. 313, 321 [201 P. 928]; *People* v. *Goldberg* (1952), 110 Cal.App.2d 17, 23 [242 P.2d 116].)

Defendants complain generally of the instructions as to "oral admissions, contradictory statements and acts or statements which may be designed to ward off suspicion." Defendants do not point out any error in these instructions and it does not appear that they could in any way have prejudiced defendants.

In oral argument the prosecuting attorney said concerning the failure of the wife of defendant Wilkes to testify, "if they were making a phone call to Mrs. Wilkes from Los Angeles at 6:00 A. M., they could not have burglarized the Village Inn in Novato. I am sure that is clear to all of you and that is the reason for this fabricated stuff. But the phone call, according to them, was to Maxine Wilkes. . . . Where was she during the last four days? Apparently very close by and very much in evidence."

Defendants' counsel said, "I object to that as prejudicial misconduct, and ask the jury be instructed as to the right of a wife not to testify."

The court said, "The question is not her right not to testify, but whether or not the best evidence has been brought out by the party to whom it is available. . . . I suppose you can discuss the phone call."

The prosecuting attorney continued, "I am not talking of Maxine Wilkes testifying against her husband, but I am saying, why didn't she take the stand and testify for him? Who would know better than she whether or not Oscar Leon Wilkes called from Los Angeles on the morning of January 31st? You didn't hear from her."

After argument the court as part of its formal instructions gave the jury the following instruction, pertinent here only because the court had previously said that the question as to Mrs. Wilkes' failure to testify concerned "whether or not the best evidence has been brought out by the party to whom it is available": "That evidence is to be estimated not only by its own intrinsic weight but also according to the evidence which is in the power of one side to produce and the other to contradict and if weaker or less satisfactory evidence is offered when it appears stronger and more satisfactory evidence was within the power of a party the evidence offered should be viewed with distrust."

Section 1322 of the Penal Code provides, "Neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties, except with the consent of both . . .''

It was error for the prosecution to comment on the failure of Mrs. Wilkes to testify. (*People* v. *Klor* (1948), 32 Cal.2d 658, 663 [197 P.2d 705]; *People* v. *Harmon* (1948), 89 Cal.App.2d 55, 61-62 [200 P.2d 32]; see *Thompson* v. *Hickman* (1948), 89 Cal.App.2d 356, 365-368 [200 P.2d 893].)

Such error has repeatedly been denounced but held not to have been prejudicial in the circumstances of the particular cases in which it has occurred. Because of such repeated holdings, it appears from the brief of the People, prosecuting officials have come to the belief that erroneous conduct in this regard is, as a matter of law, not cause for reversal. The conduct here, as in previous cases where it has been rebuked but held not prejudicial, was manifestly deliberate. Regrettably, the circumstances make it apparent that we must recognize and deal with the fact that such conduct will not be discontinued as long as it is merely rebuked. (See *People* v. *Ford* (1948), 89 Cal.App.2d 467, 472 [200 P.2d 867] ["we have extended our remarks respecting misconduct in the hope that they will be taken as a serious effort to inspire a greater degree of responsibility, duty and caution on the part of those prosecutors who are either careless in the observance of the rights of the accused or wholly in-

different to the consequences of their misconduct. It is regrettable that so much is left for reviewing courts in the way of discouraging misconduct. Fewer judgments would have to be reversed if the trial courts were more firm in controlling the comparatively few prosecutors who need restraint''].)

The prosecution's comment erroneously and deliberately struck at the heart of defendants' only defense, their sharply controverted alibi. When defendants' counsel objected to the prosecution argument the trial court, instead of instructing the jury as to the wife's right not to testify, as counsel requested, aggravated the effect of the error by stating that ''The question is not her right to testify, but whether or not the best evidence has been brought out by the party to whom it is available''; then the trial court instructed the jury that ''if weaker or less satisfactory evidence is offered when it appears stronger and more satisfactory evidence was within the power of a party the evidence offered should be viewed with distrust''; thus the jury were erroneously told that because Mrs. Wilkes was not produced as a witness it should distrust defendants' testimony that they talked with her on the telephone. Contrary to the effect of the trial court's instructions, Wilkes had no power to produce his wife as a witness if she did not consent to testify. Furthermore, the trial court erred in indicating that there was anything ''better'' as a matter of law about the testimony of Mrs. Wilkes than the testimony of defendants themselves.

Because of the erroneous comment of the prosecuting attorney and the trial court as to Mrs. Wilkes' failure to testify, the judgments and order appealed from are reversed.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied July 6, 1955.