[Civ. No. 4976. Fourth Dist. Mar. 22, 1956.]

LAURA A. HAWKE, Respondent, v. T. M. BURNS, Appellant.

Deadrich, Bates & Stewart and Kenneth H. Bates for Appellant.

Borton, Petrini, Conron & Brown for Respondent.

GRIFFIN, J.—This is an action against defendant T. M. Burns, individually, and as a copartner doing business as Burns Furniture Company, and as executor of the estate of Charles Edwards Burns, deceased, for damages for injuries due to a fall on a ramp between two salesrooms. Prior to trial defendant Charles Edwards Burns, one-half owner of the furniture company with his son T. M. Burns, died and the son was substituted as executor of his estate. Plaintiff, 62 years of age, went to a fixture-furniture store operated by defendant in the early afternoon of October 10, 1953, to make a purchase. The store premises consisted of four separate stores facing North Street, in Taft. These stores were on different ground levels separated by partitions. There were open doorways or archways leading from one room to another. The main entrance to the store was into the first salesroom. The office was at the rear of this room, which room was about 17 feet wide. The entrance from this room to the second sales room to the east was an open double doorway or archway. The floor of the second salesroom was between 5 and 6 inches lower than the floor of the main salesroom. A ramp existed at that passageway to take care of the difference. It was covered with linoleum and a loose black rubber mat 3 feet wide. The second salesroom to the

east was about 17 feet wide, and between the floor of it and the third salesroom there was a variation in the floor level of 2½ to 3½ inches over a distance of 16 inches. (The evidence is in dispute in this respect.) The archway at this point is about 16 feet wide, but showcases and other fixtures occupied over one-half of this space. Another declining ramp is located there to adjust the two levels. It was at this point where plaintiff fell. The floor was there covered with linoleum, tan in color, with asphalt tile of different colors set in the linoleum where the ramp declined. This was partially covered by a 3-foot black corrugated rubber mat. This ramp was installed in 1938. The next salesroom to the east (the Maple Shoppe) did not have any variation in the elevation of the adjoining floors.

Plaintiff testified that as she entered the main storeroom door, she first inquired at the office as to the whereabouts of a certain clerk; that it was indicated to her that she was in the "Maple Shoppe"; that she then turned in an easterly direction, proceeded through the first archway and down that ramp without difficulty; that a man preceded her and that she followed about 10 feet behind him; that apparently he turned in another direction and she proceeded "just as you would on a floor with no slope," and "all of a sudden I didn't see the ramp or anything . . . I just spun . . . it just felt like I was out in space . . . There was nothing there. My hands flew up and my purse hit a showcase." An "X" mark was indicated by her at a point about the middle of the passageway and about halfway down the 16-inch ramp as the place where she fell on the floor and severely injured her knee. The clerk in the Maple Shoppe noticed her and offered to assist her but she asked not to be moved. Later, with some difficulty, she walked out to her car, drove away, and secured a doctor, and a part of the patella was removed. It was indicated there would be some permanent and stationary crippling condition in the right knee. She testified she had never been in this portion of the store before, and that she would not consider the lighting on that afternoon very good. The counters and cases in the store were covered with various wares and there were a number of advertising signs posted about.

The evidence as to the height of the ramp at the point involved is in conflict and confusing. Defendant Burns, called under section 2055 of the Code of Civil Procedure, placed

the variance in the level of the two floors at 2⅛ inches at one point and 2½ inches "where the walking is done" because he measured it, but he "guessed it was four to six inches before measuring because it looked that depth"; that the length of the ramp was 16 inches, and it was constructed in 1938.

A duly qualified architect testified he was familiar with the requirements of the Uniform Building Code of 1952 in that county and the photographs of the store in evidence. He was then propounded a hypothetical question by counsel for plaintiff, i. e., assuming he owned a store with a doorway 16 feet in width without a handrail or warning signs and with a drop between the top level and the bottom level of somewhere between 2⅛ inches and 3½ inches over a distance of 16 inches would that construction be in accord with approved engineering and architectural practice in Kern County? Objection was made to the question on the ground that the evidence did not show the facts stated. Counsel for plaintiff then said he would later supply those facts. The objection was overruled and the answer was that the slope of a ramp considered to be in accordance with the best practice and adopted by the Uniform Building Code must not exceed "one in eight," i. e., 1 inch in 8 inches, and 2 inches maximum in height for 16 inches, and that 2 inches maximum height would only allow a 16-inch ramp; that at 2⅛ inches the minimum standard would be 17 inches; that where the doorway ramp was 16 feet in length, good architectural and customary practice required a handrail to be placed in the center and one at either side of the extremities of the ramp; that any slope in excess of 1 inch in 8 inches, regardless of width, requires a handrail, and for a passageway in excess of 88 inches in width would require a handrail. The witness stated that he had the Uniform Code with him and quoted the section from which he said he was reading. He stated he did not know the provisions of the Uniform Building Code in this respect in 1938, but he understood they were the same as he had stated, and the only way he could prove it would be to find an old issue. It was shown that none of the parties could find such issue.

During the trial plaintiff's investigator went to defendant's store and took measurements of the ramp and its elevation. Plaintiff's witness testified that it was "just a hair" under 3½ inches on one side and 3½ inches on the other, and the ramp extended out 16 inches. He testified he called a photographer

to take a picture with a ruler so indicating and that defendant stopped him; that defendant called the officers and kept him from taking pictures until he had obtained the consent of his lawyer or a court order. A draftsman testified for defendant that he prepared charts indicating the variations in the height of the ramp at different levels and stated the lighting condition in the store, when the photographs were taken, was, as reflected by a light meter, average in light, and was ''at least as good or well lighted'' as the average building with artificial illumination.

The clerk in the Maple Shoppe testified she saw plaintiff approach the ramp and she was looking back and talking to some woman when she was about 4 feet from the incline; that she turned to wait on a customer and shortly thereafter saw plaintiff in the process of falling in the middle of the ramp.

The theory upon which the jury found defendants to be negligent, of course, is not disclosed. There is evidence produced from a hypothetical question propounded to the architect to the effect that where the doorway and passageway of the ramp is 16 feet in width, a handrail in the center and at each end is indicated by the Uniform Building Code as the best practice. Although the doorway and ramp itself may be 16 feet in width at this point, the majority of the space was occupied by showcases and other fixtures and only about 8 feet or one-half of that space was used as a passageway. From the evidence there would be no requirement of three such handrails as indicated by the witness, and the answer of the witness in this respect was not based on the true factual situation. Accordingly, no negligence could be predicated upon this testimony and it was error not to grant the motion to strike this portion of the answer since it was one of the acts of negligence which plaintiff's counsel claimed they had established at the trial in his argument to the jury. (*Natural Soda Products Co.* v. *City of Los Angeles,* 109 Cal.App.2d 440, 443 [240 P.2d 993] ; *Preston* v. *Hubbell,* 87 Cal.App.2d 53, 61 [196 P.2d 113].)

Defendant contends that when specific acts of negligence are alleged, without alleging negligence in general terms, it is error to accept, over objections, evidence of other specific acts of negligence not pleaded, citing such authority as *Marovich* v. *Central Calif. Traction Co.,* 191 Cal. 295 [216 P. 595]. The complaint does not directly allege that the failure to install

and maintain three handrails at this particular ramp was one of the acts of negligence relied upon by plaintiffs. It pleaded, in general terms, that in respect to the specific claims of negligence, "among other things, the said defendants and each of them were negligent in the manner in which they maintained, operated and conducted said store and premises." Had the facts been as reported in the hypothetical question and answer, defendants could not be heard to complain in this respect. There is, however, the additional evidence that the ramp did exceed, by a small margin, the allowable slope of 1 inch in 8 inches, and that this would extend the requirements of the ramp to 17 or more inches in order to comply with the Uniform Code section as it existed in 1952, which provision the witness believed was the same in 1938; that the ramp, from the elevation indicated, required a slope in excess of 16 inches; that the passageway exceeded 88 inches in width and a handrail was required. The jury might have been justified in believing that defendants were negligent in maintaining the premises in this condition. (*Nunneley* v. *Edgar Hotel*, 36 Cal.2d 493 [225 P.2d 497].)

It is argued in this respect that the variance of 1 inch in respect to the width of the ramp would be so slight in reference to its slope that it could not be reasonably said that this variance could be held to be the proximate cause of the accident. This was a factual question for the jury to determine and its implied finding may not be disturbed on this appeal although there may be considerable merit to the claim. (*Crawford* v. *Southern Pac. Co.*, 3 Cal. 427, 429 [45 P.2d 183].) The same may be said as to the implied finding that plaintiff was not guilty of contributory negligence. (*Tuttle* v. *Crawford*, 8 Cal.2d 126, 130 [63 P.2d 1128].)

Since plaintiff's counsel bore heavily upon this testimony in his argument to the jury, complaint is made as to the admissibility of the testimony relating to the attempt of plaintiff to obtain photographs of the ramp and premises during the trial of the action and the claimed eviction of plaintiff's witnesses by defendant and the police department in this endeavor. Based upon this evidence plaintiff offered and the court gave the general instruction that "If and when you should find that it was within the power of a party to produce stronger and more satisfactory evidence than that which was offered on a material point you should view with distrust any weaker or less satisfactory evidence actually offered by him or her on that point." There is some merit to

this contention. It is not contended that the instruction as given is not the law. The argument is that there was no proper evidence to support it, and that although legal in form, it was error to give it under such circumstances. It appears from the evidence that defendants, several months prior to trial, did allow plaintiff to take all the pictures she desired of the premises, including one of the ramp being measured in the same manner discussed on the latter occasion, but which pictures plaintiff failed, for certain reasons, to produce. The latter entrance was made without notice to defendant's counsel or to defendant and upon a guise that plaintiff had an order so to do from Judge Howden's court, through Mr. Brown, attorney for plaintiff.

Defendant testified that he asked the photographer to produce the court's order and he "hemmed and hawed" and finally said that he was taking the pictures "for Mr. Brown of Judge Howden's court"; that he refused to allow it without a court order or permission of defendant's counsel, since his counsel had told him not to allow any pictures to be taken in there without his consent; that he called the police and, after consultation, the police told the photographer that the consent of defendant or a court order was required, otherwise he must leave the premises. It appears that an investigator for plaintiff appeared at defendant's premises a day or two before trial when defendant was out to lunch, and upon explaining to the employees that Mr. Brown had requested him to take some measurements, over their objections he took measurements of the store at the place indicated and defendant was informed of that fact after returning from lunch.

It appears to us that under the circumstances related the admission of this testimony and the argument of counsel based thereon was inadmissible and may well have tended to inflame the jury and prejudice defendant's case. The jury had the advantage of the testimony of plaintiff's witness in respect to the conditions which he saw there on that particular day, and the only possible objection would be to the taking of a photograph of these same conditions by placing a ruler in position which would so indicate. There is no showing that the production of the photograph would be any better evidence, as a matter of law, than the testimony of the witnesses themselves. (*People* v. *Wilkes*, 44 Cal.2d 679 [284 P.2d 481]; *Stewart* v. *St. Paul City Ry. Co.*, 78 Minn. 110 [80

N.W. 855].) The method pursued by plaintiffs in attempting to secure this picture and these measurements was upon the implied representation that it was under a court order. It was without the consent of counsel for the defendant and the testimony in reference to alleged concealment should not have been admitted. However, the court did instruct the jury that "if and when" it should find that it was within the power of a party to produce stronger and more satisfactory evidence the jury should view with distrust any weaker and less satisfactory evidence offered. We will assume that the jury followed the instruction. Prejudicial error does not affirmatively appear.

The next complaint pertains to the admission of certain testimony, received over objections, as to defendant being insured against such an accident. It appears that defendant was absent from the store on the day of the accident and had no direct knowledge of its cause. When he learned of it he went to the hospital and took plaintiff a box of candy and expressed his regret about the accident and her injury. Plaintiff claimed in her testimony that as he was about to leave he said: "Well, we carry insurance . . ." At that point counsel for defendant interrupted the witness and the court excused the jury and a discussion was had between counsel about the testimony. A mistrial was requested and denied. The court, after being informed of the complete answer expected, overruled the objection and allowed the witness to complete it. She then testified he said: "Mrs. Hawke, I am sorry this happened . . . We are insured for such as this . . . You go after them and we will back you up." The defendant most emphatically denied any such conversation. Immediately after the introduction of this testimony the court instructed the jury that the only purpose for its admission was for the jury to determine whether these statements attributed to defendant constituted an admission against interest; that no insurance company was a party to the action, and the jury was not allowed to speculate upon it or allow that fact to concern it during the course of deliberations. The jury returned a verdict for plaintiff in the sum of $7,202.36. Plaintiffs made the novel claim, on the motion for new trial, that since the jurors were so questioned on *voir dire* in reference to whether they owned stock in or were otherwise connected with any insurance company (which was allowable) the jury was fairly well apprised that defendant was insured, and that any additional mention of that fact was not prejudicial. It

is here argued that the answer of the witness contained an admission of liability, and that therefore the entire answer was admissible and no error resulted since the court fully instructed the jury as to the limited purpose for which it was received, citing such authority as *Symons* v. *Wooden,* 97 Cal.App. 39 [274 P. 987]; *Rowe* v. *Rennick,* 112 Cal.App. 576 [297 P. 603]; *Fleming* v. *Flick,* 140 Cal.App. 14 [35 P.2d 210]; *Lafrenz* v. *Stoddard,* 50 Cal.App.2d 1 [122 P.2d 374]; *Kroplin* v. *Huston,* 79 Cal.App.2d 332 [179 P.2d 575]; *Freeman* v. *Nickerson,* 77 Cal.App.2d 40, 53 [174 P.2d 688]; *Galbraith* v. *Thompson,* 108 Cal.App.2d 617 [239 P.2d 468]; 11 So.Cal.L.Rev. 407, 423; and 21 So.Cal.L.Rev. 236.

As opposed to these authorities, defendants claim the very statement thereof does not indicate any admission of liability but only a willingness "to stick the insurance company," citing *Mahnkey* v. *Bolger,* 98 Cal.App.2d 628, 636 [220 P.2d 824], and cases cited therein.

There appears to be some merit to the argument. If defendant did make the statement attributed to him it was apparently made with the feeling that he was going to be sued for plaintiff's claimed injuries, and it indicates that he was willing to cooperate with the plaintiff in procuring a settlement with the insurance company, and he may have later awakened to the fact that he should not be "backing plaintiff up" in her claim. Just what claim, if any, she made to him about his negligence is not indicated. ██ Subject to certain qualifications and exceptions, it is error to inform a jury in an action for damages that an adversary carries insurance. (*Roche* v. *Llewellyn Iron Works Co.,* 140 Cal. 563 [74 P. 147]; 11 So.Cal.L.Rev. 408, and cases cited.) ██ It is now the general rule that where a defendant makes a statement which may be fairly construed as an admission or acknowledgment of responsibility and as a part of the same statement makes incidental reference to the fact that he carries insurance, the entire statement is admissible, not to prove the fact of insurance but solely because the reference to the insurance is part of the admission. (21 So.Cal.L.Rev. 236.) Certain expressions have been held admissible under this theory such as in *Lafrenz* v. *Stoddard,* 50 Cal.App.2d 1 [122 P.2d 374] (hearing in Supreme Court denied) an automobile negligence case, where it is said that where a defendant stated to plaintiff after an automobile accident that "I don't want you to worry too much. I am well insured and they will have to

make good," the entire statement, including the reference to insurance, may properly be admitted into evidence where the court instructs the jury to disregard the portion "I am well insured," and admonishes it that no insurance company is a party to the action and that the evidence is admitted only to show the admission of liability. See also *Symons* v. *Wooden*, 97 Cal.App. 39 [274 P. 987], in a similar action, where defendant said: "Don't pay any of the damages, we are carrying insurance, we are fully protected, don't pay the repair bill, present your bill to the surety company, it will be paid"; and *King* v. *Wilson*, 116 Cal.App. 191, 195 [2 P.2d 833] [hearing in Supreme Court denied], where defendant said: ". . . he was sorry it all happened but he had insurance to pay for everything." It was there said that the added words "to pay for everything" might leave one to conclude that no other inference could logically be drawn therefrom except an acknowledgment of responsibility and declaration against interest. (See 11 So.Cal.L.Rev. 423 for many other such instances.) ■ In the present case the court left that question to the jury and told it that the statement should not be considered for any other purpose. We must conclude that it does not here affirmatively appear that prejudicial error resulted, particularly where the trial court instructed the jury in reference to its limited effect, and also where the trial court reconsidered the question of the claimed prejudicial effect of the statement on a motion for new trial. (*Hatfield* v. *Levy Bros.*, 18 Cal.2d 798 [117 P.2d 841]; *Weis* v. *Davis*, 28 Cal.App.2d 240 [82 P.2d 487].)

We have examined the instructions given and refused and conclude that the instructions given were adequate and sufficiently covered defendant's proffered instructions.

■ Complaint is next made because the trial court refused to allow defendant to testify that when the ramp was constructed in 1938 his contractor secured a building permit for such construction, relying upon the inference that it must have been constructed at that time in accordance with the existing Uniform Building Code. The only question before the jury was whether defendant, at the time of the fall, maintained the premises in a proper manner. The fact that defendants did or did not have a permit 16 years before to make certain improvements at that location would not necessarily be determinative of the question before the jury. (*Strandt* v. *Cannon*, 29 Cal.App.2d 509, 518 [85 P.2d 160]; *Armenta* v. *Churchill*, 42 Cal.2d 448 [267 P.2d 303].) Furthermore, it will be

presumed that defendant did obtain a permit at the time, since it would have been a violation of the law not to do so. (Code Civ. Proc., § 1963, subd. 33.) The statement of the architect to the effect that he assumed the provisions of the 1938 Uniform Building Code were the same as in 1952, was elicited by defendant's counsel on cross-examination. Otherwise, plaintiff offered no evidence to show that there was any violation of the law or such rules in respect to the construction of the ramp in the first instance. Accordingly, the evidence sought was inadmissible. (*Head* v. *Wilson*, 36 Cal.App.2d 244, 253 [97 P.2d 509].)

It is next argued that the court erred in refusing to allow defendant to testify that no person had previously fallen in this area. Plaintiff produced no evidence to the contrary. It was held in *Owen* v. *Rheem Mfg. Co.*, 83 Cal.App.2d 42, 50 [187 P.2d 785], that for certain limited purposes the plaintiff may prove previous accidents but a defendant, at least in the first instance, may not prove absence of previous accidents.

Finally, it is claimed the court erred in receiving into evidence certain portions of Dr. Varney's testimony in reference to his prognosis as to plaintiff's lack of chances for a complete recovery. We see no merit to the contention. (*Rohner* v. *Cross*, 121 Cal.App. 667 [9 P.2d 509] ; *Davis* v. *Renton*, 113 Cal.App. 561 [298 P. 834].) Furthermore, although the deposition was received in evidence it was not made a part of the record on this appeal, and we have no means of determining that error was committed in its reception into evidence. (*Utz* v. *Aureguy*, 109 Cal.App.2d 803, 806 [241 P.2d 639] ; Rules on Appeal, rules 5 and 52.)

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied April 18, 1956.