[Crim. No. 3037. Fourth Dist., Div. Two. May 23, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. EUGENE CHAVEZ, Defendant and Appellant.

Edward P. Foley, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and A. Barry Cappello, Deputy Attorney General, for Plaintiff and Respondent.

McGOLDRICK, J. pro tem.*—Defendant Chavez was convicted of violating Penal Code, section 207 (kidnaping) and Penal Code, section 261, subdivision 3 (rape). His trial was severed from defendant Chastain. The jury found him not guilty of the charge of rape but guilty of the charge of kidnaping. Probation was denied and he was sentenced to state prison. From this judgment, he appeals.

The evidence can be summarized as follows:

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Mr. and Mrs. Mills were members of Alcoholics Anonymous. Both had been drinking during the day of the alleged kidnaping and rape. On October 27, 1966, they decided to drive from Bakersfield, where Mr. Mills was night manager of the Tower Motel, to San Bernardino for the purpose of consulting with a friend, Mr. Jarrett, relative to employment prospects and assistance with their drinking problem. Upon arriving in San Bernardino, they discovered Mr. Jarrett was not home and thereupon went to the Alano Club, a social club for sober members of Alcoholics Anonymous. Mrs. Mills was given a cup of coffee there. Mr. Mills was requested to leave because of his recent drinking. After leaving the Alano Club, Mr. Mills purchased a six-pack of beer and returned, with Mrs. Mills, to the home of Mr. Jarrett. Instead of providing accommodations for the Mills, Mr. Jarrett took them to an inexpensive hotel. Mr. Mills felt the room was not worth the price, however, and decided to return to Bakersfield, notwithstanding some trouble he had been having with his car and over the dissent of Mrs. Mills. Sometime after midnight, October 28, 1966, they set out for Bakersfield by way of Barstow. Their car broke down on the way through the Cajon Pass. While waiting for assistance they each drank a can of beer from the six-pack purchased earlier.

Defendant Chavez had also been drinking earlier with his brother. He went to defendant Chastain's house about 1:45 a.m., October 28, and they decided to visit Las Vegas. Both got into Chavez' car, Chastain driving, and proceeded until they encountered the Mills' car parked at the summit of Cajon Pass, sometime after 2 a.m. Defendants and the Mills conversed and it was agreed defendants would take Mr. and Mrs. Mills into Barstow where they might seek help. Mrs. Mills and Chavez sat in the back seat, which momentarily befuddled Mr. Mills but he got into the front seat next to Chastain without objection. Mr. Mills opened the four remaining cans of beer and passed one to each of the other occupants, keeping one for himself. Chastain told Mr. Mills they were going to Las Vegas to "sell some pornographic pictures." Chavez placed his hand on Mrs. Mills' knee. Mrs. Mills testified she removed it and turned the conversation to her son in Vietnam, in order that Chavez would be discouraged and realize she was older. Chavez conversely testified she permitted him to keep his hand there. Shortly thereafter Mrs. Mills, upon being told the radio was inoperative, commenced

humming a tune. Mr. Mills offered to give defendants money and the pink slip to his car in return for a ride to Bakersfield.

Defendant Chavez testified that Mrs. Mills told him (a) she was mad at her husband about the motel room, (b) she was in the mood for a party, and (c) she wanted to get rid of her husband. Chavez assumed she desired sexual intercourse.

After traveling some distance along the highway, defendant Chastain said, ''I'm going to go . . . [to] . . . a cabin up here and we have got some beer in it.'' The car traveled about a mile over a bumpy dirt road, known as the Wild Wash turnoff, and came to a stop. Chavez and Chastain got out of the car, meeting in the rear at the trunk. Defendants testified their conversation concerned Mrs. Mills' desire to ''go with Chavez'' who in turn sought Chastain's aid in getting rid of her husband. Neither Mr. or Mrs. Mills overheard the conversation.

Upon returning to the car, defendants changed seats, Chastain getting in back with Mrs. Mills and Chavez driving back toward the freeway. At the bottom of the hill, Chavez made a short left turn and pretended to be out of gas by switching the key off and on. Asserting they were out of gas, Chavez asked Chastain to get some. Chastain responded he had asthma and could not venture into the night air. Mr. Mills said, ''I guess it's up to you and me, fellow.'' Mr. Mills and Chavez then got out of the car. Defendant Chavez testified that as he got out of the car, Mrs. Mills stood up, grabbed him and said, ''I'd sure like to get rid of my old man.'' As Mr. Mills started around the rear of the car, Chavez jumped back into the car, slammed the door and locked it. Mrs. Mills testified that she started screaming, reached for the latch and screamed for her husband to grab the door handle, but Chastain grabbed both her arms, pulling her back into the car which then sped off.

Mrs. Mills testified that upon being pulled down into the rear seat by Chastain, she hit her head and was shocked and temporarily stunned. She is not clear when Chastain and Chavez again exchanged seats, but states that Chavez drove away and Chastain held her down until sometime later.

Mrs. Mills testified that Chavez got into the back seat with her, Chastain driving, and tried to unbutton her dress. The car turned left along a dirt road, went a considerable distance and by the time it stopped she was practically undressed. Chavez ordered her to take off the remaining garments. When she refused he threatened her by pulling back his hand saying, ''Take off your clothes.'' She said, ''Don't do this, it

isn't worth it and you are just getting yourself in a lot of trouble." Mrs. Mills then partially disrobed by removing her dress, hose, girdle and panties. Chavez took off his pants and had intercourse with her. He was with her for what seemed forever and Chastain said, "It's my turn," to which Chavez responded, "I'm not through yet." Chastain said, "I can't help it, it's my turn," and they exchanged places. Chastain was completely disrobed upon entering the back seat and had intercourse, reaching a climax in a short time. Chavez then returned and engaged in another act of intercourse for a long time during which she begged to be let up. Chastain then returned to the rear seat, Chavez going to the front, had intercourse a second time and reached a climax shortly. At approximately the same time Chavez indicated that he finally had reached a climax in the front seat. While defendants were pulling on their clothes in the front seat, Chavez said, "We can't let this one go," but Chastain felt she wouldn't say anything and suggested dumping her off on the highway. Mrs. Mills told defendants she wouldn't say anything and told Chastain she would go out with him again if he came to Bakersfield and would get him the money he might need if she got to Bakersfield, asserting that she was expecting a property settlement through her attorney, Dustin Jameson. Chastain then gave her a Flying-A-Win-A-Check envelope and a pencil whereupon she wrote out her name and correct address. She started to write her attorney's name but Chastain took the envelope. Chavez drove back to the highway, let her out and she identified the letters SHS on defendants' license plate. Mrs. Mills then saw and stopped a highway patrol car complaining that she had just been raped. She was taken to a sheriff's substation in Victorville where she described the defendants. Photographs were taken of her arms showing bad bruises in the area where Chastain had grabbed her.

Officers Huff and West testified that Mrs. Mills was hysterical when she flagged them down and continued to be for some time thereafter. It did not appear to Officer Huff that she had been drinking, but Officer West noticed a substantial odor of alcohol about her.

Codefendant Chastain, called as a witness for the People, testified that Chavez had asked him if he could get Mr. Mills out of the car because his wife wanted to get rid of him. He replied that he would not. Chavez then drove the car back toward the highway, came to a stop, and said he was out of gas. Chavez asked him to go back and get some gas. At this time Mr. Mills volunteered to get the gas. When Mr. Mills was

out of the car, Chavez locked the door and drove off. Chavez then tried to have intercourse with Mrs. Mills but couldn't get an erection. When Chavez couldn't get an erection, he got into the back seat and had intercourse with Mrs. Mills. Later, while he was engaged in his second act of intercourse with Mrs. Mills, he heard Chavez saying "something about coming."

Before Mrs. Mills got out of the car, she gave him her name and address and told him that if he visited her with a friend, she had a couple of girl friends.

Defendant Chavez testified that the following statements which were taped by Detective Callahan were correct.

After leaving Mr. Mills behind, Chavez got into the back seat with Mrs. Mills and kissed and fondled her. He told her he wished to have intercourse. She responded by lifting her dress, taking down her girdle and nylons. Chavez was unable to get an erection and his attempted intercourse was unsuccessful. Defendant Chastain then had intercourse with Mrs. Mills. Thereafter Chavez made another unsuccessful attempt.

Before leaving the car, Mrs. Mills gave Chastain her address and told him she wanted him to come and visit her.

Detective Callahan testified concerning a taped conversation between him and Chavez as follows:

"Gene, do you honestly think that this woman voluntarily went with you? She voluntarily left her husband?

"Not really voluntarily. No, but after we got rolling she says that she wanted to leave him and she was getting tired of him." Detective Callahan testified this statement was made after full advisement of defendant's rights and of his own free will without promises or threats.

Several questions are presented in this appeal, viz., (1) misconduct of the district attorney, (a) calling defendant's wife as a witness, (b) improper examination of witness Steven Chastain, (c) improper cross-examination of defendant; (2) defendant's right to jury trial was waived by the court's ruling on voluntary nature of defendant's statements under Evidence Code, section 405; (3) court's failure to instruct that corpus delicti must be established independent of the extrajudicial statements of defendant; and (4) defendant's attorney was incompetent.

■ The chronology which relates to the subdivisions of the first question on appeal took place as follows: The deputy district attorney called defendant's wife to the stand as a witness in rebuttal after the defense rested. His counsel objected on the grounds of privilege and moved for a mistrial.

Iṅ the judge's chambers it was disclosed by the district attorney that he had not obtained the wife's consent to be called as a witness. The judge in chambers explained the privilege allowed under section 970, Evidence Code, and the wife chose not to testify whereupon they returned to court, with the jury present and the judge did admonish them to disregard the district attorney's statement that he wished to call defendant's wife as a witness.

Defendant contends that although the privilege under section 970, Evidence Code, may only be urged by the wife, nevertheless, the calling of her as a witness so prejudiced defendant in the minds of the jurors that the court's admonishment was unavailing. Evidence Code, section 970, changed the rule in California on husband and wife privilege. Section 970 reads: "Privilege not to testify against spouse. Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding."

The privilege thus created runs to the spouse called as a witness and a married defendant cannot prevent her from testifying if she chooses to do so.

 It is therefore evident that defendant's objection to the wife being called as a witness does not have legislative sanction. (Evid. Code, § 970; see Law Commission's Comment, Evid. Code, §§ 970-971; Witkin, Cal. Evidence (2d ed. (1966) 776-777.) Moreover, defendant created whatever prejudice resulted in the jury's mind, if any, by making the unwarranted objection.

Defendant relies on *People* v. *Wade,* 53 Cal.2d 322, 331 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Ward,* 50 Cal.2d 702, 712 [328 P.2d 777, 76 A.L.R.2d 911]; *People* v. *Wilkes,* 44 Cal.2d 679, 686 [284 P.2d 481]; and *People* v. *Klor,* 32 Cal.2d 658, 663 [197 P.2d 705], to support his position that the district attorney's conduct was prejudicial. Defendant contends that under *Wade, supra, Ward, supra,* and *Klor, supra,* the conduct of the prosecutor, under former statute, Penal Code, section 1322, was error. However, in each of these cases the court held that the error was not so serious as to cause reversal. In *Wade, supra,* the defendant's wife was called and compelled to testify over objection. *Wilkes, supra,* is the only case cited where there was a reversal. However, in *Wilkes,* the district attorney commented to the jury in argument about the wife's failure to testify and the reversal was based on this rather than the error in calling the wife in the first instance.

430

In *Klor, supra,* the prosecutor commented in argument on the wife's failure to testify.

In the case at bench, the prosecution made no comment to the jury and the wife was not forced to object to being called as a witness, (a situation deemed prejudicial in the Law Revision Commsision's comment) and the error, if any, that resulted was harmless. (Cal. Const., art. VI, § 13.)

Subdivision (b) of question No. 1 relates to the conduct of the prosecutor in examining codefendant Chastain. Reference is here made to both defendants' intent to visit Ash Meadows, a reputed place of prostitution, and posing certain obscene statements allegedly made by defendant to Mrs. Mills.

Also, it is claimed that to bring Chastain into court in prison garb and reference to his previous trial allowed the jury to speculate that defendant's partner in crime was already convicted and inferred guilt by association.

Reference to Ash Meadows and the obscene statements made to Mrs. Mills relate to the subject of sex and bear upon the charge of rape. It is difficult to perceive how this would prejudice defendant in the minds of the jurors when he tacitly admitted an attempt to have intercourse with Mrs. Mills. The questions were asked in good faith. The prosecutor had previously interrogated Chastain in his separate trial on the same matters. These matters are discussed in *People* v. *Perez,* 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], as follows: " 'It was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied.' " The deputy district attorney who tried Chastain was the same as in the case at bench, and since he received affirmative answers to the same questions in the Chastain trial, there is clear indication of good faith, etc., to meet the test of *Perez.*

No authority has been found that bringing a witness into court in prison garb is prejudicial and contrary to defendant's claim, the showing of a conviction of a prior felony is proper in impeaching one's own witness. Evidence Code, section 785, reads: "Parties may attack or support credibility. The credibility of a witness may be attacked or supported by any party, including the party calling him."

Evidence Code, section 788, reads, in part: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony. . . ."

Also, no objection was made regarding the alleged misquote of evidence by the district attorney and it may not be made for the first time on appeal. (*People* v. *Duncan*, 175 Cal.App.2d 372, 383 [346 P.2d 521]; *People* v. *Deacon*, 117 Cal.App.2d 206, 210 [255 P.2d 98].)

We turn to defendant's next contention, i.e., that Evidence Code, section 405, is unconstitutional because it conflicts with the guaranty provided for the right of trial by jury. We need not pass on this contention since the defendant consented to the playing of the tape recording to the jury which contained the most damaging admission to Officer Callahan of the kidnaping charge that Mrs. Mills "did not really go with him voluntarily." No objection was raised as to the voluntary nature of the statement. Moreover, defendant requested that the record be played rather than its intended use of refreshing the officer's recollection. In addition, when defendant was asked about this statement by his own counsel as to whether they were substantially correct, he answered, "Yes." This dispels any question of involuntariness under these circumstances.

Finally, defendant contends that he wasn't advised of his rights under *Dorado-Escobedo* by Detective Callahan when first questioned and that at this time the investigation had already focused on him. Under *Miranda* v. *State of Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *People* v. *Ing*, 65 Cal.2d 603, 613 [55 Cal.Rptr. 902, 422 P.2d 590], custodial interrogation, rather than focusing of an investigation, is a requisite element. "By *custodial* interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*People* v. *Arnold*, 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515].) Detective Callahan's inquiry, before advisement of *Miranda* rights, was restricted to the investigation of some 59 license numbers received by him from the Department of Motor Vehicles and based on Mrs. Mills' recollection of the letters SHS. Defendant then was not in custody or even a prime suspect. Furthermore, the damaging admission, *supra*, was made after proper *Miranda* advisement.

■ Defendant next contends that the court erred in not giving, *sua sponte*, CALJIC 296 (establishing corpus delicti independent of confessions and admissions). We find no merit on this point since in the case at bench the corpus delicti was established by an abundance of evidence independent of defendant's admissions. (*People* v. *Howk*, 56 Cal.2d 687, 707 [16 Cal.Rptr. 370, 365 P.2d 426] ; *People* v. *Holbrook*, 45 Cal. 2d 228, 234 [288 P.2d 1] ; *People* v. *Robbins*, 225 Cal.App.2d 177, 184 [37 Cal.Rptr. 244].)

■ Defendant's final complaint regarding the incompetency of his attorney is also without merit. No objection was raised at the trial nor complaint made by defendant that his counsel was inadequate. Failure to object to leading questions certainly does not indicate incompetency rather it sometimes is considered good trial technique not to object. A review of the entire proceedings in this case does not show it to have been a sham or a farce. (*People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487] ; *People* v. *Barreras*, 181 Cal.App.2d 609, 617 [5 Cal.Rptr. 454] ; *People* v. *Jones*, 177 Cal.App.2d 420, 423 [2 Cal.Rptr. 305].)

The judgment is affirmed.

Kerrigan, Acting P. J., and Tamura, J., concurred.