[Crim. No. 335.   Fifth Dist.   May 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES PERRYMAN et al., Defendants and Appellants.

James Perryman, Willie Perryman, in pro. per., and S. Carter McMorris, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Craig G. McIntosh, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J. — Appellants, James Perryman and Willie Perryman, together with Arthur Mayfield, John D. Crumpton and John Cooper, were charged by indictment with burglarizing the Collins Electric Company in Sacramento. All defendants were charged with being armed with "deadly weapons, to wit, a 25-Calibre Automatic and a 38 S. and W. Revolver."

The Perrymans were tried separately, and convicted by a jury of burglary first degree. They were also found guilty of possession of a deadly weapon at the time of the offense.

Numerous thefts of copper wire in the Sacramento area prompted the police to conduct a surveillance of the places of business of four firms dealing in wire, including Collins Electric Company. Officers Shierts and Chatoian were assigned positions within the Collins Electric Company building. Detective Sergeants Asbury and Bennett, wearing civilian clothing, were stationed near the building in unmarked cars; a fifth officer, Sloan, was parked a short distance away near the intersection of 13th and V Streets.

Shierts and Chatoian had reached the yard of Collins Electric Company about 8 :40 p.m. when they observed five male adult Negroes in a light-colored 1957 Chrysler sedan driving slowly by the plant. Shierts recognized one of them as Arthur Mayfield. He also jotted down the license number of the car, MZD 405. Chatoian recognized another occupant of the car, although he could not recall the man's name at the time.

Shierts and Chatoian entered the building and took positions to conduct their surveillance. In about 20 minutes Mayfield, Crumpton and Cooper entered the building through a window, maneuvered four Collins Electric Company pickup trucks by hand and loaded them with copper wire of a value of about $16,000. Cooper left through the window, and walked up an alley behind the building. About this time Crumpton discovered Officer Chatoian, so the officers placed Crumpton and Mayfield under arrest. Mayfield was carrying a .22 caliber automatic; Crumpton tossed a .38 caliber Smith and Wesson revolver into a small box, and a holster which the gun fitted was found on the floor near Crumpton's feet. It was then about 11 p.m.

In the meantime, Officer Sloan, parked near the intersection of 13th and V Streets, observed a light-colored 1956 or 1957 Chrysler westbound on V Street, proceeding very slowly; he estimated the speed between 5 and 10 miles per hour. This was about 9 :45 p.m.

Sergeant Asbury, parked on V Street between 13th and 14th, saw a 1957 white Chrysler traveling slowly, probably 10 to 12 miles per hour, westerly on V Street, about 9 :50 p.m. The car was occupied by two male Negroes. He observed the numerals, 405, on the license, but could not read the letters. He watched the car turn north on 12th Street, and within two or three minutes he saw it coming south on 12th Street. The car made a U-turn and again proceeded northerly. About four minutes later it again came into his view, traveling westerly on V Street at a speed of 8 to 10 miles per hour. At this time he was able to read the entire license number, MZD 405.

Asbury and Bennett stopped the automobile and obtained identification from the occupants. Sergeant Bennett radioed Officer Shierts inside the Collins plant, described the car he and Asbury had stopped, and gave the names of the Perrymans. Shierts advised Bennett that a burglary was in progress; he verified the license number of the car, and instructed Bennett to hold the men, as they were implicated.

Appellants explain their activities the night of the burglary as follows: Early in the evening they and their wives, with a Mrs. Hawkins, Mayfield, Crumpton and Cooper, were at Willie Perryman's house. They played a card game until about 7 :30, when Crumpton left. James Perryman left about 8 p.m. in his Chrysler sedan, to take the three women to a bus station. About 8 :20 p.m. Willie Perryman, Mayfield and Cooper left in Willie's pink and white Chrysler automobile;

they stopped at a liquor store, then at Crumpton's home to pick him up, then, at Mayfield's request, they drove to an apartment house located at 1312 V Street, where Mayfield said his brother lived. Willie stopped the car in the alley behind the apartment, and Crumpton, Mayfield and Cooper left the car and walked along a breezeway which extended from the alley to the street in front of the apartment building. They returned in about five minutes, and Mayfield instructed Willie to drive them around the block.

Willie testified that he drove around the block, stopped on V Street across from the Collins Electric building, where the three men left the car. This was about 9 p.m. and Willie said he never saw the men again that evening. Willie met his brother James, at a bar by prearrangement; they took Willie's car home because it had defective lights, and cruised around the area in James' car trying to find the place where Willie had let Mayfield out. Both Willie and James testified they had decided to give up the search and go back to the bar when they were stopped by the police.

Appellants assert their constitutional rights were violated for a number of reasons. They contend their arrest was illegal, that they were the victims of an unlawful search and seizure, and that they were not advised of their constitutional right to have an attorney and to remain silent at the time they were arrested. They argue that the officers had no right to stop them in the first place because before stopping them Officer Bennett had not been advised by Officer Shierts that a burglary was being committed.

The circumstances facing the officers when they stopped appellants may be summarized as follows: The officers were conducting a surveillance because copper wire had recently been stolen in the area; they observed appellants' car maneuvering to remain in the industrial or warehouse part of town where wire had been stolen, it was moving very slowly and the occupants were looking about in the immediate vicinity of the electric company where wire was stored; it was nighttime, there was little traffic in the area and there was no apparent reason for appellants' unusual activities.

The rule by which we test the officers' conduct in stopping appellants is expressed by the Supreme Court in *People* v. *One 1960 Cadillac Coupe,* 62 Cal.2d 92, at pages 95-96 [41 Cal.Rptr. 290, 396 P.2d 706] : ''It is well established that a police officer in the discharge of his duties may detain and question a person when the circumstances are such as

would indicate to a reasonable man in a like position that such a course is necessary to the proper discharge of those duties.'' (See *People* v. *Rogers,* 241 Cal.App.2d 384, 386 [50 Cal.Rptr. 559].)

We conclude that the circumstances outlined above would indicate to a reasonable man in the position of the officers that the car should be stopped and an investigation made. From that point on there is no question about the reasonableness of the arrest. The information relayed to Officer Bennett by Shierts confirmed that a felony had just been committed, that two of the persons participating in the crime had been occupants of the car a short time earlier, and the car was identified by license number.

As to appellants' Fifth Amendment argument, the arresting officer testified that he advised them of their rights, as required by the *Escobedo* (*Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]) and *Dorado* (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) cases, and since this case was tried before *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], came down, the extensive rules thereof are not applicable. (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) In any event, the only statement of either appellant made prior to the time Sergeant Bennett advised them of their Fifth Amendment rights was the statement of James, ''We were just passing by,'' in answer to Sergeant Asbury's question, ''What are you doing in this—in this vicinity of town?'' Certainly there was nothing incriminating in this simple answer to a legitimate preliminarily investigatory question.

There is even less merit to the argument that appellants' Fourth Amendment rights were violated. The record discloses no search of the automobile or of the home of either of them, and no evidence was introduced which was obtained during a search.

Appellants argue that reference by the district attorney to a common law wife of appellant James Perryman constituted misconduct in that it disparaged, humiliated and ridiculed the ''cause of defendants.'' To ask a question for the purpose of degrading or disparaging a witness is misconduct, of course (*People* v. *Savage,* 66 Cal.App.2d 237 [152 P.2d 240] ; *People* v. *Jordan,* 169 Cal.App.2d 727 [337 P.2d 912]), but we do not think the questions asked by the district attorney, when viewed in context, were degrading or dis-

paraging, or were offered for that purpose. During cross-examination of a witness produced by the defense, the deputy district attorney asked:

"Q. How long have you known James Perryman? A. Oh, I'd say about three years, maybe.

"Q. About three years? A. Yes.

"Q. Do you know the—do you know the person that also—the female person that also lives with James Perryman? A. Yes, I do.

"Q. What's her name? A. Her names is Artha May Little-john.

"Q. And how many children do they have there? A. Six."

A few questions later, the deputy district attorney asked the witness:

"And James' common-law wife walked over to Willie's place; is that right? A. Yes, we did."

Thereafter the deputy district attorney merely referred to the "wife" of James.

On the other hand, James, while testifying, referred to the woman as "My common-law wife."

▮ Moreover, no objection was made at the time of trial and it is too late to object on appeal. (*People* v. *Hillery,* 62 Cal.2d 692, 706 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Pike,* 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656].)

▮ Appellants make the additional contention that the evidence is insufficient to connect them to the crime, since they were in an automobile some distance away at the time the burglary was committed. Their guilt rests on Penal Code section 31, which provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed."

The words "aid" and "abet" as used in the section, are said by the court, in *People* v. *Masters,* 219 Cal.App.2d 672, at page 679 [33 Cal.Rptr. 383], to mean: " 'Aid,' . . . means to assist, to help, or to supplement the efforts of another and does not imply guilty knowledge of felonious intent. [Citations.] To 'abet' a person in the perpetration of a crime one must aid or assist the direct perpetrator with knowledge of his wrongful purpose. [Citations.] In order to hold an accused as an aider and abettor, the test is whether the

accused, in any way, directly or indirectly, aided the perpetrator, with knowledge of the latter's wrongful purpose, by words or gestures. [Citations.] Accordingly, one may aid and abet without having previously entered into a conspiracy to commit a crime.''

█ Whether one has aided and abetted in the commission of a crime is a question of fact for the jury to determine from the totality of the circumstances proved. (*People* v. *Silva,* 143 Cal.App.2d 162, 169 [300 P.2d 25].) █ Factors which the jurors may consider in making such determination include presence at the crime, companionship and the conduct of the accused before and after the offense. (*People* v. *Fleming,* 191 Cal.App.2d 163, 168 [12 Cal.Rptr. 530].)

█ It must be owned that the conviction rests on circumstantial evidence, so we look to the evidence. Appellants testified that earlier in the day they had been playing cards with Mayfield, Crumpton and Cooper, the men who actively participated in the burglary. Willie Perryman admitted that during the evening, not long before the time of the burglary, he had been in the company of the same three men in the area where the burglary was committed. Officers Shierts and Chatoian saw five Negro men in the James Perryman car in the vicinity of Collins Electric approximately 20 minutes before Mayfield, Crumpton and Cooper entered the building. Shortly thereafter the same vehicle with only the appellants as occupants was seen cruising slowly around the block, and on one occasion making a U-turn, apparently for the purpose of remaining in the immediate vicinity. We conclude that substantial circumstantial evidence supports the jury's verdict.

█ There remains appellants' request that the armed clause be stricken from the judgment. They assert that since neither of them was armed with a deadly weapon at the time the offense was committed and they were some considerable distance from the scene of the crime and away from the burglars who had weapons, they were not armed within the meaning of Penal Code sections 969c and 3024.

Precisely this question was considered by the court in *People* v. *Stevens,* 32 Cal.App.2d 666 [90 P.2d 595]. The court discusses the purpose of statutes providing increased punishment when a deadly weapon is used in the perpetration of a crime that may be committed without its use. It is pointed out that the legislative intent adheres to an aider and abettor as much as to the participant who has possession of the weapon.

The court said, at pages 670-671: ". . . it must be held that the participation of a defendant not actually in possession of the weapon by aiding and abetting the actual possessor in the unlawful use of the weapon makes the former equally liable with his armed confederate to the added penalty inflicted upon defendants who commit crimes through the use of dangerous and deadly weapons. To hold otherwise would to a marked degree nullify, impair and materially weaken the objects sought to be accomplished by this salutary legislation.

"We have given careful consideration to the New York cases cited by appellant [citations], wherein the courts of that state hold that under statutes similar to ours the extra punishment provided is to be imposed only upon the one in actual and personal possession of the dangerous weapon. We are, however, constrained to hold that the better reasoning and more correct conclusions are found in the cases decided by the appellate courts of our own state."

The reasoning in *Stevens* must be distinguished from the principle enunciated in *In re Shull,* 23 Cal.2d 745 [146 P.2d 417]. In *Shull* the court explains that the armed clause, requiring an additional penalty, does not apply to a crime in which the deadly weapon is an essential element of the crime charged and without which the crime cannot be committed. The crime involved in *Shull* was an assault with a deadly weapon.

It is necessary, also, to distinguish situations resulting in double punishment resulting from the armed clause. In *People v. Thomsen,* 239 Cal.App.2d 84 [48 Cal.Rptr. 455], the unarmed defendant was convicted of aiding and abetting in the commission of a robbery. The fact one of the robbers was armed raised the degree of the robbery from second to first. We held that to increase the basic minimum sentence because one of the robbers was armed and additionally to impose a mandatory consecutive minimum sentence of five years for the same reason, subjected the defendant to double punishment.

Here, the burglary was committed by entering a building in the nighttime; it was a first degree burglary for that reason and not because two of the burglars were armed. Therefore, finding that appellants were armed did not constitute double punishment.

The judgments are affirmed.

Conley, P. J., and Gargano, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 5, 1967. Peters, J., was of the opinion that the petition should be granted.