[Crim. No. 14842.   Second Dist., Div. Five.   May 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GILBERT RICHARD MORGA, Defendant and Appellant.

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jerold A. Prod, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J.—Defendant Gilbert Richard Morga was convicted for burglary (Pen. Code, § 459 violation) by a court sitting without a jury. His motion for new trial and request for probation were denied and he was sentenced to state prison. At the same time, his probation in an earlier case, No. 320784, in which he had pleaded "nolo contendere" to a charge of statutory rape (Pen. Code, § 261, subd. 1), was revoked and a sentence of one year in the county jail imposed and suspended. His notice of appeal states merely that he appeals

from "the judgment and sentence," but the notice lists both the current and earlier case Nos. A225037 and 320784.

He contends: (1) the evidence is insufficient to support his conviction for burglary, (2) he was prejudicially denied the right to separate counsel, and (3) his probation was improperly revoked in case No. 320784. We conclude that no prejudicial error was committed and that both the judgment in the instant case and the order revoking probation in case No. 320784 should be affirmed.

### The Procedural Background

Defendant Morga and two co-defendants, Edward Guzman and Alfred Jurado, were charged in an amended information with burglary (Pen. Code, § 459), and a Frank Aguilar with receiving stolen property (Pen. Code, § 496). A prior felony conviction for rape (Pen. Code, § 261, subd. 1) was charged against Morga, which he denied.

At the preliminary hearing, Morga, Guzman, and Jurado were represented by the same deputy public defender. On the morning of trial, November 15, 1967, the deputy public defender then representing the defendants announced that there was a conflict of interest between Jurado on one hand and Morga and Guzman on the other. He requested appointment of a private counsel for Morga and Guzman. A private practitioner in the courtroom volunteered to undertake the representation of the two, without compensation. After a short recess, he conferred with the deputy public defender and announced that he was "going to suggest a jury waiver and submission on the transcript." Aguilar, represented by a different retained attorney, moved for a severance of his case and severance was granted. All three remaining defendants (Morga, Guzman, and Jurado) and their respective counsel waived jury trial and agreed that the court could read and consider the transcript of the preliminary hearing as evidence. Further proceedings were continued to November 20, 1967. On the latter date, the three defendants testified, the People put on an arresting officer as a rebuttal witness, and the case was submitted. The court found Guzman "not guilty" and Morga and Jurado "guilty as charged." The reporter's transcript reflects the court fixing the burglary at first degree, but the judgment reflects that no degree was fixed and no disposition of the prior felony conviction pleaded. We therefore treat the burglary as being of the second degree. (Pen. Code, § 1157; *People* v. *De Arkland* (1968) 262 Cal.App.2d 802, 818 [69 Cal.Rptr. 144].)

## The Evidence

The *testimony of Mrs. Irene Montes,* the victim of the burglary, given by way of the transcript of the preliminary hearing was as follows: She was returning from the market about 9:15 in the evening of September 3, 1967. As she first drove up, she saw a car parked "on the wrong side of the street." In the lights of her car, she saw the head of one person in the car and two people outside, kneeling on the grass. The front door to the driver's seat was open. She saw the faces of Guzman and Morga, who were outside the car. She turned her car around and parked it across the street from her apartment and was taking groceries out of her car, when she spotted Jurado carrying her television set from her home to the car parked across the street. Jurado had said, "Okay, let's go," and Morga and Guzman were getting into the car. She ran across the street and tried to stop them. Jurado got into the back seat and slammed the door. She remonstrated against their taking her television set and "grabbed the driver." Morga was the driver. As she struggled with Morga, Jurado and Guzman helped brush her off. The car drove off without lights. There were in all, four people in the car, two in front and two in back. She saw the faces of three, but not that of the fourth person.

*Fernando Nejera's testimony* reflected by the transcript of the preliminary hearing was as follows: He was a police officer of the City of Los Angeles, working a radio car that evening. He received a call around 9:15 or 9:20, proceeded to the location, and interviewed Mrs. Montes. She reported that four male Mexicans had taken "a TV out of her house, they had used force." "She tried to stop the one that was carrying it and she tried to stop the driver. [¶] She gave me a description of three of the suspects and she told me that the fourth suspect was either passed out drunk or was asleep in the back seat of the car." She also described the car and her television set in detail. He located the car parked, about two hours later, with three male Mexicans in it, two in the back seat and one in the front. He and his partner maintained surveillance of the vehicle, waiting for the fourth suspect to show up. In due time, he saw Jurado, the one described as having taken the television in the burglary, emerge from a house, holding two $10 bills in his hand. Apparently, just Jurado and two of the three persons in the car were arrested.[1]

[1] "We took him back to the police car. Advised him and the other two persons in the vehicle of his constitutional rights."

He then proceeded to the house from which Jurado had emerged and knocked on the door. It was opened by Aguilar. He saw a television set fitting the description given to him by Mrs. Montes just three feet from the front door. He thereafter arrested Aguilar.

*Jurado* testified at the trial: Before he took the television set, he, "Richard Morga and *Joe* Guzman" and another person had gone to a "love-in" in the afternoon. He later corrected "Joe Guzman" to Eddie Guzman and named the other person as one called "Joe." Asked, "How did you happen to pick up Joe?" he replied, "Well, he was with us before, with me and Richard Morga." They left the "love-in" about 8 ("[i]t was getting dark already") in a car, which he believed was Morga's. He and the others had drunk about a gallon of wine. He had also taken "heroin and seconals" about 10 a.m., and was "pretty intoxicated." He had not drunk much wine.

He told the driver that he "was going to go see some girl." Her name was "Nellie"; he had just met her a week before. He knew approximately where she lived. He went to see the girl, got out of the car, and walked up a flight of stairs. It was 10 to 15 yards uphill. He knocked on the door. The door was open and the television was on. He stepped inside to see if anybody was there, noticed no one around, and therefore took the television and walked out. He did not intend to steal anything until he was inside the apartment.

The others did not know he was going to "steal the TV," because even he didn't know that he would when he left the car.

When the lady came out, he told her that the television belonged to his friend, which was a lie. He lied because he was stealing the television set. "I put it in the car, and then she started hollering." On cross-examination, however, he denied that the lady hollered. He told the others, "[i]t is probably her mother," and the car took off. Morga was not driving at the time, but he could not recall just who was driving. Morga did drive at times that evening. He could not recall where the others in the car were seated. He did not see anyone prevent the lady from recovering her television set. There was no "scuffling or hassling." He denied that the lady grabbed the driver or that the driver pushed her hands off.

They took the television set to a friend's (Aguilar's) house. He did not want to take it to his home as his parents would know that it was stolen.

He claimed that the $20 was in his pocket. He had worked at some upholstering place in Alhambra, the name of which he could not recall. "[His] parole officer [had] it." He had been paid the Friday preceding the day of his arrest.

*Guzman* testified at the trial: He recalled being in the car with Jurado and Morga. The three went to a "love-in" at Elysian Park. He had been drinking wine. They stayed at the "love-in" until it got dark, around 8 or 8:30. They had a gallon of wine. He drank quite a bit. He did his drinking in the morning. He did not do any drinking at the "love-in."

After leaving the "love-in," he, Jurado and Morga went driving a bit. Jurado mentioned a girl. He recalled that they parked awhile at one place, and then parked at another place. He was sitting in the back seat when he was handcuffed. He was asleep and woke up with handcuffs on. He saw a "TV," but didn't pay much attention to it. He had no idea when Jurado mentioned going to see a girl that Jurado would "end up taking a TV set." Asked, whether there was a hassle or a pulling with a woman in connection with the television, he replied, "Not that I recall, sir." He did not see any woman come out or claim the set as hers. He had no recollection of seeing the woman, who testified at the preliminary, on the night in question. He did not know Aguilar.

They switched drivers from time to time during the period he was in the car. He did not do any driving. He had no driver's license. He could not recollect Jurado doing any driving. Morga did some of the driving, but he could not recall who was driving at the time he saw the television set.

*Morga* testified at the trial: He could not recall too much as to what transpired on the night of September 3d as he was "well intoxicated." They went to a "love-in" at Elysian Park, got some wine, and got drunk. They left the "love-in," went cruising around for a while, Jurado mentioned something about stopping and seeing a girl. At that moment, he was on the passenger side of the front seat, so he told the driver, a fellow named "Joe," to go ahead, that Jurado would tell him where the girl lived. Then he "passed out," "flaked out," or "knocked out."

The next thing which he remembered was being arrested. He was seated on the passenger side of the front seat. No one was behind the wheel. The officer opened the door, put handcuffs "on them," and took "them" to the police car.

Jurado had introduced him to "Joe" at the "love-in." He had never met him before that. He was introduced only as

"Joe." That day was the first and last time he has ever seen "Joe." He first stated that "Joe" was driving when they left the "love-in," later correcting it to his having been the driver when they left the "love-in." He did not remember who drove the car to the location where he was arrested.

On cross-examination: The car belonged to his sister and he used it. Asked who else was in the car at the time of his arrest, he replied, "I think it was Eddie Guzman, and that fellow Joe." The prosecutor then asked whether Richard Guzman, the brother of defendant Guzman, wasn't then in the car. He acknowledged that he was. He could not recall when they had picked up Richard Guzman. Next question, "Well, what happened—what happened to Joe? A. He was gone. I don't know. I was knocked out. I don't remember nothing, you know. I don't remember nothing from after we had changed places driving."

He did recall Jurado saying he wanted to visit a girl. The cross-examination proceeded as follows: "Q. Do you remember who was driving then? A. I was driving—no, I wasn't driving then. I was knocked out in the car. Q. You were knocked out? A. Yes, sir. Q. Well, could you hear him say that he wanted to visit the girl? A. Yes, sir. Q. Were you knocked out at that time? A. Yes, sir—No, I wasn't knocked out then. No. Q. When did you become knocked out? A. After I had let Joe drive the car. After I told him, 'Well, take him to his girl friend's house.' Q. Then you became knocked out? A. That is when I fell out. Yes, sir. Q. Well, when did you do any drinking? A. At the love-in—before the love-in when we got there. Q. Well, how many house [sic] was it before you did any drinking before you say you were knocked out? A. How many hours? Q. Yes. A. Well, we were at the love-in, and we were drinking then. After I got out of the love-in, we still had some wine and we finished it." He was knocked out from around 8:30 or 9 o'clock until he was arrested.

He did not remember any television having been in the car. He did not know at any time that Jurado "was going to go in and take a TV set." He did not hassle with any woman trying to hold his arm. Mrs. Montes' testimony that she came over to the driver's side of the car is not true. He did not remember any woman claiming that the television set was hers. He did not know Aguilar.

Thereupon, the *court* interrogated Morga: "THE COURT: You drove from the love-in? THE WITNESS: Yes, sir. THE COURT: And you drove for an hour or so? THE WITNESS:

Something like that, sir. When I got through—you know, I couldn't control the car too much any more, so I mentioned to one of the fellows that they would drive for awhile. THE COURT: You stopped? THE WITNESS: Yes, sir. THE COURT: This fellow Joe then started to drive? THE WITNESS: Yes, sir. THE COURT: And when was it that Mr. Jurado said something about visiting his friend, the girl? THE WITNESS: I would say about half an hour later. THE COURT: And then you told the fellow who was driving to go to that friend's house? THE WITNESS: Yes, sir.''

*Officer Nejera,* called as a rebuttal witness on behalf of the People, testified: When he arrested the defendants, Morga ''was behind the steering wheel with his head leaning on the window—on the left side of the door.'' Guzman was in the back seat, directly behind Morga on the left-hand side. Another person, Richard Guzman, the brother of defendant Guzman, was on the right-hand side. Only these three persons were then in the car. Jurado was just exiting from Aguilar's house, and when he raised his hand he had two $10 bills in it. In his opinion: Morga ''might have been drinking, but he was not drunk''; Edward Guzman had been drinking and ''was probably still drunk at the time''; Jurado did not appear to be under the influence of anything; and Richard Guzman was very drunk.

### Evidence Sufficient

■ Defendant contends that the evidence is insufficient in that at most it proves defendant guilty only of the offense of being an accessory (Pen. Code, § 32), which is not a lesser and necessarily included offense to the principal crime of burglary (*People* v. *Baker* (1958) 164 Cal.App.2d 99, 108 [330 P.2d 240]). However, whether one has aided and abetted the commission of a crime is a question of fact for the jury to determine from the totality of the circumstances proved. (*People* v. *Perryman* (1967) 250 Cal.App.2d 813, 820 [58 Cal.Rptr. 921] (burglary); *People* v. *George* (1968) 259 Cal.App.2d 424, 429 [66 Cal.Rptr. 442] (robbery); *People* v. *Fleming* (1961) 191 Cal.App.2d 163, 169 [12 Cal.Rptr. 530] (assault with a deadly weapon).)

Factors which a finder of fact may consider in this determination ''include presence at the crime, companionship and conduct of the accused before and after the offense.'' (*People* v. *Perryman, supra*; *People* v. *George, supra*; *People* v. *Fleming, supra*.) Possession of stolen property and flight with a companion committing a burglary may also be con-

sidered. (*People* v. *Tyler* (1968) 258 Cal.App.2d 661, 667 [65 Cal.Rptr. 907].) One who drives another to the scene of the crime, serves as a lookout, and drives the getaway car can be an aider and abettor. (Cf. *People* v. *Ellhamer* (1962) 199 Cal.App.2d 777, 781 [18 Cal.Rptr. 905] (robbery).) While such factors do not carry as strong an inference as in the case of a robbery, because burglary is completed with the entry, nevertheless these factors may be considered in determining whether one aided and abetted the commission of a burglary. (*People* v. *Martin* (1954) 128 Cal.App.2d 361, 364 [275 P.2d 635].)

The intent with which Morga acted must be considered from all the facts and circumstances of the case; if the inference that he acted with the necessary criminal intent is bottomed upon substantial evidence, the finding may not be disturbed on appeal. (*People* v. *Tolstoy* (1967) 250 Cal.App. 2d 22, 25 [58 Cal.Rptr. 148]; *People* v. *Williams* (1967) 252 Cal.App.2d 147, 154 [59 Cal.Rptr. 905].) His denial of any knowledge that Jurado was on a burglary mission does not constitute irrebuttable proof of such fact. " 'Few criminals would ever be convicted if their explanations were accepted as gospel truth.' [Citation.]" (*People* v. *Carlson* (1960) 177 Cal.App.2d 201, 204 [2 Cal.Rptr. 117].)

It cannot be said that the trial court had no substantial basis for finding Morga guilty upon the theory that he was an aider and an abettor. He drove the car from the "love-in" by his own admission. Mrs. Montes identified him as one kneeling outside the car, who jumped in as Jurado yelled, "Okay, let's go." She identified him as the driver of the getaway car, the one with whom she was struggling as the car drove off without lights. From this, it may be inferred that he was the one who drove the car to the scene of the burglary and acted as a lookout. He drove off, knowing that Jurado was running off with Mrs. Montes' television set.

In addition, the court could have found from the evidence that both Morga and Jurado were falsely testifying about the mythical driver, "Joe," thus indicating a consciousness of guilt from their joint falsehood. (*People* v. *Wayne* (1953) 41 Cal.2d 814, 823 [264 P.2d 547]; *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397]; *People* v. *Wilkes* (1955) 44 Cal.2d 679, 683 [284 P.2d 481].) It is significant that Jurado committed a slip of the tongue by first characterizing Guzman as "Joe Guzman." Jurado testified that "Joe" had been with him and Guzman before going to the "love-in," yet

Morga states that he was introduced to "Joe" at the "love-in." Morga's testimony concerning "Joe" in his cross-examination reveals his getting trapped and then changing his testimony. Significantly, Guzman never did mention "Joe." Guzman testified that Morga drove at times at least, but that he did not drive and he did not see Jurado drive. Officer Nejera also testified that at the time of arrest, Morga was sitting behind the steering wheel. Morga admitted that the car was his sister's and that he used it. From all of the foregoing evidence, the trial court was justified in doubting Morga's credibility as evidenced by its interrogation of Morga.

Officer Nejera testified that while Morga had been drinking, he was only under the influence of alcohol. By Morga's own answers to the court's questioning, he had driven for approximately one and one-half hours up to the time he was "knocked out." Worthy of note is that he knew the approximate hour of 8:30 or 9 p.m. as being the time he was so "knocked out." Morga's credibility as a witness was thoroughly destroyed. Whether the state of intoxication is such as to render one incapable of entertaining the requisite knowledge or specific intent necessary to commit a crime is for the trier of fact to determine; and its finding upon conflicting evidence will not be disturbed on appeal. (*People* v. *Wilson* (1968) 261 Cal.App.2d 12, 20 [67 Cal.Rptr. 678]; *People* v. *Philbrook* (1939) 34 Cal.App.2d 449, 450 [93 P.2d 577]; *People* v. *Sutton* (1936) 17 Cal.App.2d 561, 568 [62 P.2d 397].)

The fact that the evidence is circumstantial and is not as strong as in the average case does not warrant a reversal. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal. Rptr. 30, 401 P.2d 382], cert. denied, 386 U.S. 938 [17 L.Ed. 2d 810, 87 S.Ct. 958]; *People* v. *Redrick* (1961) 55 Cal.2d 282, 289-290 [10 Cal.Rptr. 823, 359 P.2d 255].)

*No Prejudicial Error in Not Appointing Separate Counsel*

■ Defendant claims that since both he and codefendant Guzman were too intoxicated to know anything about codefendant Jurado's having committed a burglary, his placing the television set in the car, or of Mrs. Montes trying to prevent them from running off with it, it became self-evident, especially after Officer Nejera testified that Guzman was drunk but Morga "might have been drinking, but he was not drunk," that effective cross-examination by a single counsel representing both was blocked. To attack the officer's capacity to distinguish between degrees of intoxication would have done a

disservice to Guzman, who was acquitted by the court prior to argument by counsel. On the other hand, it was imperative to Morga's defense to show that he was too drunk to form the requisite knowledge to make him an aider and abettor of Jurado's burglary. There is plausibility for such an argument by a counsel under the enjoinment of *People* v. *Feggans* (1967) 67 Cal.2d 444, 447-448 [62 Cal.Rptr. 419, 432 P.2d 21], and in the light of *People* v. *Chacon* (1968) 69 Cal.2d 765, [73 Cal.Rptr. 10, 447 P.2d 106], and the decision of this court in *People* v. *Baker* (1968) 268 Cal.App.2d 254 [73 Cal.Rptr. 758]. However, in view of the evidence which we have detailed at length above, we feel beyond a reasonable doubt that absent this error, if it be error, the court would have reached the result it did. Hence, there was no prejudice. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

### No Error in Revocation of Probation

■ One of the conditions of probation in case No. 320784 was that Morga "obey all laws." Not only was he convicted of the felony in the instant case, but by his own testimony he was guilty of misdemeanor drunk driving (Veh. Code, § 23102). The latter violation alone would have been sufficient to revoke probation. The order which the court made, however, was one redounding to defendant's advantage. True, there was no formal arraignment for judgment, but when the court imposed a one-year county jail sentence and suspended it, the net effect was to drop the crime to a misdemeanor (Pen. Code, § 17; *People* v. *Kelley* (1958) 161 Cal.App.2d 215, 222 [326 P.2d 177]) and to restore defendant to probation without supervision for one year. Since a sentence may not be suspended except in conjunction with a grant of probation, the suspension of the sentence was tantamount to a grant of probation. (*Oster* v. *Municipal Court* (1955) 45 Cal.2d 134, 139 [287 P.2d 755]; *People* v. *Municipal Court* (1956) 145 Cal. App.2d 767, 771 [303 P.2d 375].) Although it was possible to place defendant on probation up to three years (Pen. Code, § 1203a), it was for a one-year period only since the trial judge omitted expressly setting it for longer than one year. (*People* v. *Rye* (1956) 140 Cal.App.2d Supp. 962, 965 [296 P.2d 126].) More than one year having elapsed since the order in question was made on January 8, 1968, it may well be that the conviction itself now can be set aside upon defendant's motion. (Pen. Code, § 1203.4; *People* v. *Banks* (1959) 53 Cal. 2d 370, 388 [1 Cal.Rptr. 669, 348 P.2d 102].)

*Disposition*

The judgment in case No. A225037 and the order revoking probation in case No. 320784 are affirmed.

STEPHENS, J.—I concur:

I agree with the result reached in the majority opinion. There is, as I understand the principles of law involved, considerable variance in the application of standards currently applied in the troublesome areas of quality of separate counsel and effective joint counsel. It seems to me that if we are to follow down the path as lighted for us in the instant case by defendant and by the suggestion in the dissenting opinion, we must reach the conclusion that separate counsel is mandatory in all joint trials. This path is not so well lighted as to prevent the shadow of mandatory separate counsel from supplanting the more discrete holding of *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], and thus require reversal of every joint trial wherein defendants had joint counsel. Such a result would naturally follow in a situation where the defense was adversely affected as it related to one of two defendants because of their joint counsel (*People* v. *Chacon,* 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106]), or where one defendant is prejudiced by association with a codefendant (*People* v. *Gallardo,* 269 Cal.App.2d 86 [74 Cal. Rptr. 572]). I do not so understand the rule to dictate this result, nor do I believe we should so extend the right to adequate counsel where separate counsel are involved. "The right to counsel at trial guaranteed by the Sixth Amendment of the United States Constitution (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]) and article I, section 13 of the California Constitution does not include an automatic right to separate counsel for each codefendant. One counsel may represent more than one defendant so long as the representation is effective. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 171-172, 53 S.Ct. 55, 84 A.L.R. 527])." (*People* v. *Chacon, supra,* 69 Cal.2d 765, 773-774.) The court in *Chacon* states that it is in effect adopting the standard of reasonable doubt recognizing the right to effective counsel as one of constitutional dimension: ". . . If counsel must represent conflicting interests or is ineffective because of the burdens of representing more than one defendant, the injured defendant has been denied his *constitutional right to effective counsel.*" (69 Cal.2d at p. 774.)

212

"The extent of the conflict of interest and its impact on Mr. Lopez's effectiveness, was certainly not.so slight that we can ignore it.[3]"

In such a situation, it does not necessarily follow that defendant's representation would be reduced to a "farce or a sham." (*People* v. *Ibarra, supra,* at p. 464.) In the *Ibarra* situation, the "error" can never be treated as harmless because such representation is in reality no representation at all and is prejudicial *per se.* (See *Chapman* v. *California,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; *Gideon* v. *Wainwright, supra,* 372 U.S. 335.) That which ultimately proves to be an erroneous appointment of one counsel to represent two defendants, however, is not so antagonistic to a fair trial that its infraction can never be treated as harmless. Rather, the question is whether the error complained of might have contributed to the conviction (*Fahy* v. *Connecticut,* 375 U.S. 85 at pp. 86-87 [11 L.Ed.2d 171, 173-174, 84 S.Ct. 229]), and the People must demonstrate beyond a reasonable doubt that it did not. (*Chapman* v. *California, supra,* at p. 24 [17 L.Ed.2d at p. 710].)

The problem with reconciling *Ibarra* with *Chacon* is that *Ibarra* and its progeny have enunciated a standard that admits of no middle ground. The cases have either proceeded to find that counsel's ineptitude reduced the trial to a "farce or a sham," in which case the "error" is reversible *per se* (see *People* v. *Welborn,* 257 Cal.App.2d 513 [65 Cal.Rptr. 8]; *People* v. *Keesee,* 250 Cal.App.2d 794 [58 Cal.Rptr. 780]; *In re Grossi,* 248 Cal.App.2d 315 [56 Cal.Rptr. 375]; *People* v. *Natividad,* 240 Cal.App.2d 244 [49 Cal.Rptr. 437]), or have resolved the issue with the conclusionary statement that it did not, in which case reversal is not required. (See *People* v. *Batista,* 257 Cal.App.2d 413, 419 [64 Cal.Rptr. 718] : "Such strategy did not reduce the trial to a 'farce or a sham,' *the test used to determine whether counsel's representation was ineffective"* (italics added); *People* v. *Birdwell,* 253 Cal. App.2d 621 [61 Cal.Rptr. 536]; *People* v. *Adams,* 249 Cal.

"[3]Several United States Courts of Appeal have adopted much the same position that we take here. In *Lollar* v. *United States, supra,* 376 F.2d 243, 247, the court stated: '(O)nly where "'we can find no basis in the record for an informed speculation' that appellant's rights were prejudicially affected," can the conviction stand. . . . In effect, *we adopt the standard of "reasonable doubt,"* a standard the Supreme Court recently said must govern wherever the prosecution contends the denial of a constitutional right is merely harmless error.' See also *Campbell* v. *United States* (D.C. Cir. 1965) 352 F.2d 359, 360-361 [122 App.D.C. 143]; *Sawyer* v. *Brough* (4th Cir. 1966) 358 F.2d 70, 73-74." (Italics added.) (69 Cal.2d at p. 776.)

App.2d 501 [57 Cal.Rptr. 389]; *People* v. *Elledge,* 186 Cal. App.2d 656 [9 Cal.Rptr. 188].) It seems perfectly clear to me that counsel may be ineffective to a cognizable extent without reducing the trial to a "farce or a sham," as seemingly required by *Ibarra* and the cases which have sought to follow it. If this observation is correct, then a need appears to exist for clarification of the standard enunciated in *Ibarra* and that articulated in *Chacon.* The complexity of the situation impels an appellate court in reviewing the effectiveness of joint counsel for two defendants to weigh any impairment of representation in the light of *Chapman* v. *California, supra,* while the effectiveness of counsel for one defendant is weighed by the less stringent standard (for the People) of *Ibarra.* In other words, in the case of dual representation which is determined to have been ineffective, the People must carry the weighty burden of demonstrating beyond a reasonable doubt that the "error" did not contribute to the verdict obtained, whereas in the case of a single defendant represented by ineffective counsel, the burden is on the defendant to demonstrate that his trial was reduced to a "farce or a sham," a finding which appellate courts have been consistently reluctant to make, indulging in a myriad of euphemisms to gloss over sheer ineptitude, and imputing subtle tactics to defense counsel which in all probability never were dreamed of. I am not unmindful of the fact that in the case of dual representation the state can be said to be a participant in securing the services of one counsel for two defendants. This appears to be a prime reason for requiring the state to carry the appellate burden of showing lack of prejudice. Is not the same reasoning applicable where a sole indigent defendant is provided counsel? If the crucial consideration is to afford a defendant a fair trial, conducted by competent counsel, what possible justification can there be in requiring a disadvantaged defendant to shoulder the near impossible task of proving, in effect, "beyond a reasonable doubt" that his trial counsel was totally inept—not merely ineffective? This apparent disparity in standards for reviewing defendants' claims of inadequate trial counsel calls for resolution. It has always been the state's burden to demonstrate that it has afforded a defendant a fair trial—at least, that is a defendant's constitutional right. Inferentially, it is not without significance that in effectuating this concept, the "rule" that a defendant must complain of his ineffective trial counsel at the time of trial to raise the issue on appeal has been recently undermined. (See *In re Rose,* 62 Cal.2d 384

[42 Cal.Rptr. 236, 398 P.2d 428]; *People* v. *Kirchner,* 233 Cal.App.2d 83 [43 Cal.Rptr. 218].) However, where the defendant objects to removal and substitution of his counsel, the trial court has no inherent power to accomplish that substitution even though it is the court's conclusion that defense counsel is incompetent. (*Smith* v. *Superior Court,* 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65].)

In light of *Chacon,* it appears that even where a single defendant raises the issue of incompetency of counsel, if the reviewing court finds that counsel was ineffective to a significant degree, the appellate court, to sustain the verdict, must be convinced beyond a reasonable doubt that such ineffectiveness did not contribute to defendant's conviction. On the other hand, consistent with *Ibarra,* should the court find that defendant's trial was reduced to a "farce or a sham," certainly the rule of automatic reversal will prevail, for such blatant ineptitude could not be countenanced. By such resolution, there would be established a middle ground, defining "ineffective counsel" so that the same standard is applied to both situations.

It is the necessity of a full and fair trial to which the Constitutions and our consciences are committed. If the right of a defendant is to "effective" counsel, the denial of a *fair trial* is no less real by inept or inadequate representation by counsel for one defendant than the same faulty representation of two defendants by one counsel. There should be no premium for ineffectiveness because counsel wears two hats, nor is ineptness less antagonistic to justice where he wears but one.

Returning to a consideration of the instant case, in the light of the overwhelming evidence of Morga's involvement, it cannot be deemed reversible error for the trial court to have appointed one counsel to defend both Morga and Edward Guzman. Here, the identification of Morga as the driver of the car was clearly established by the testimony of Mrs. Montes as of the time of the burglary. Morga sat in the driver's seat at the time of arrest, according to the testimony of Officer Najera, though Morga testified to the contrary. The car belonged to Morga's sister, and he acknowledged driving it during part of the day on which the crime occurred. At no time did any of the defendants place more than four persons in the car, and at the time of arrest, Edward Guzman, his brother Richard, Morga, and Jurado were at the scene. The first three were in the car, and Jurado was seen exiting from a house and going toward the car. Mrs. Montes testified there were two persons

in the back seat, the face of one of which she did not observe. As the majority opinion concludes, this person "was either passed out or was asleep in the back seat." This was the position and condition of Richard Guzman at the time of arrest.

Morga sought to involve a phantom person ("Joe") as the driver, and depended upon his claimed intoxication to absolve him from participation. The officer apparently did not arrest Richard Guzman. (This reasonably appears to be because of Richard's obvious condition and inability to participate.) The officer also, as the acquittal of Edward Guzman shows, eliminated Edward as one being able to participate. This result is in considerable conflict with the testimony of Mrs. Montes, who identified Edward and Jurado as the two who tried to get "[Mrs. Montes'] hands off of the driver so they [could] get away."

Defendant's contention is that a separate attorney might have cross-examined the arresting officer more effectively and thereby confirmed his alibi of being "flaked [passed] out." The case of *Glasser* v. *United States*, 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457], relied upon by defendant must be read in the light of its own facts. There, Glasser was represented by his own private counsel, and the additional burden of defending a codefendant was imposed upon that counsel over Glasser's objection and the fear of conflict expressed by the appointed counsel. The very conflict which concerned counsel came to pass and resulted in substantial likelihood of disadvantage to Glasser. This is a far different situation from the speculative prospect of more effective cross-examination in the case before us. Though agile minds might conceive of a *possible* lessening of a counsel's effectiveness where he defends codefendants,[1] any such lessening of effectiveness must be demonstrably present for there to be error of a constitutional magnitude. To my mind, the phantom person "Joe" conjured up by Morga is about as real as the disadvantage occasioned by Morga's not having separate counsel. The trial judge was not convinced of "Joe's" existence, nor am I convinced of the ineffectiveness of Morga's counsel.

KAUS, P. J.—A summary of my reasons for believing that this judgment must be reversed, is as follows:

---

[1] The case of *People* v. *Gallardo*, *supra*, 269 Cal.App.2d 86, is a clear example of the difference between factual disadvantage or conflict and that raised by educated and imaginative creativity.

1. I understand Justice Aiso's opinion, although I do not agree with it.

2. I agree with Justice Stephens that in many cases refusing to find that incompetence of counsel has deprived the defendant of a fair trial, the courts may have leaned over backwards in crediting counsel with fancy strategy when in fact he has butchered the defense: I just do not understand what that has to do with this case. It is one thing to presume that an attorney who represents a single defendant knows what he is doing, until the opposite is proved. It is quite another to judge the acts and omissions of an attorney who represents conflicting interests.

3. I would find it difficult to say that the evidence supports the judgment, were it not for Morga's ready obedience to Jurado's command, ''Okay, let's go,'' when Jurado came out of the house. From this the court could infer advance knowledge of what Jurado was up to. Even so the finding is perhaps not the most reasonable, having in mind that while Jurado was in the house Morga and Guzman got out of the car and knelt on the grass. Conscientious drivers of getaway cars stay behind the wheel, ready to roll.

4. The majority's emphasis on the high probability, if not certainty, that Morga was indeed the driver is a red herring. I am quite ready to assume that no court would have been taken in by the invention of ''Joe.'' That makes Morga a perjurer, but not a burglar.

5. Morga was very probably guilty of being an accessory to a completed burglary. (Pen. Code, § 32.) He is, however, appealing from a conviction as a principal.

6. Since everything depends, in my view, on Morga's readiness to abscond with Jurado and the loot, his power to resist temptation at that moment was the only real issue below. Obviously, the more intoxicated he was, the less inhibited he became and the more likely he would have been to agree to join a criminal act on the spur of the moment, making him only an accessory.

7. The fact that Morga was able to drive does not detract from this analysis. The very lack of inhibition which may have made him willing to assist in a clumsy getaway without advance notice is the quality of mind which causes drunks to drive and risk imprisonment, injury or death.

8. Because of counsel's dual representation he found himself unable to cross-examine Officer Nejera. In practical effect the officer had just acquitted one of his clients, Guzman—the court did it formally, without hearing argument, a few sec-

onds later—and any dent in the officer's credibility which could have helped Morga, could only have hurt Guzman.

*Therefore, on the most vital aspect of the entire case the dual loyalties of counsel prevented him from doing his job.* In effect Morga was deprived of confronting the most important witness who testified against him. This is not just a matter of speculation, informed or otherwise, but demonstrable from the record.

9. No one can be blamed for what occurred. When one attorney is appointed to represent two defendants, a conflict is not always discoverable by anyone at the time of the appointment. Nevertheless, it often exists. It existed in this case, although it did not surface until the People's last witness on rebuttal.

10. Justice Stephens' opinion points out that the Sixth Amendment does not compel an automatic appointment of separate counsel for each codefendant at the outset of the trial. I agree. No case that I know of, other than possibly *Ford* v. *United States,* 379 F.2d 123, has ever said so. What the Sixth Amendment does guarantee, I believe, is that if an attorney who represents a conflicting interest has been appointed and the record indicates that the defendant may have been damaged and the People do not negative this indication by a showing within the meaning of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], a reversal must follow. Any other rule would make it a difference of constitutional proportions whether at the outset of the trial the conflict is above or below the surface.

11. Whether or not the separate appointment of counsel is constitutionally compelled, I would respectfully suggest to our Supreme Court that as a matter of policy it direct trial judges, at least in felony cases, to appoint separate counsel as a matter of course. (*In re Anderson,* 69 Cal.2d 613, 632-634 [73 Cal.Rptr. 21, 447 P.2d 117].) If, after investigation, counsel conclude that no actual or potential conflict exists, the procedure for relieving one of them that is outlined in *Ford* v. *United States, supra,* can always be followed.

I would reverse.

Appellant's petition for a hearing by the Supreme Court was denied July 16, 1969. Peters, J., was of the opinion that the petition should be granted.